DANIEL J. BRODERICK, Bar #89424
Federal Defender

CAROLYN M. WIGGIN, Bar #182732
Assistant Federal Defender
Designated Counsel for Service
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: (916) 498-5700

Attorney for Petitioner
RAUDEL REYNOSO-RODRIGUEZ

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAUDEL REYNOSO-RODRIGUEZ,<br><br>    Petitioner,<br><br>v.<br><br>JANET NAPOLITANO, Secretary of Homeland Security, et al.,<br><br>    Respondents.<br>_____ | No. Civ. S-08-321 MCE KJM<br><br>PETITIONER'S REPLY TO RESPONDENT'S OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS |

**I.    Introduction**

On September 28, 2009, the magistrate judge issued Findings and Recommendations ("F & Rs") in this matter that recommended the Court conditionally grant Mr. Reynoso-Rodriguez's petition. Respondents filed Objections to the F & Rs on October 15, 2009. Petitioner Reynoso-Rodriguez now files this Reply to the Objections urging the Court to adopt the F & Rs.

*Reynoso-Rodriguez v. Napolitano, et al.*
Civ. S-08-321 MCE KJM
Petitioner's Reply to Objections to F & Rs

## II. Background

Petitioner, Mr. Raudel Reynoso-Rodriguez, was born in Mexico on October 30, 1971. He entered the United States with his parents when he was still a young child, and in 1981 he became a lawful permanent resident. A File p. 228.[1] Mr. Reynoso-Rodriguez has six siblings, all of whom are United States citizens. *Ibid.* In addition, Mr. Reynoso-Rodriguez's parents and grandfather are lawful permanent residents who reside in the United States, and he has six lawful permanent resident/citizen aunts, two lawful permanent resident/citizen uncles, 33 lawful permanent resident/citizen cousins, and numerous nieces and nephews residing in the United States. A File pp. 270-71. Mr. Reynoso-Rodriguez has no immediate family members in Mexico and is not in touch with any distant relatives in Mexico.

Mr. Reynoso-Rodriguez and his family are long-time residents of Butte County and had lived in the same home in Oroville for some 20 years at the time of Mr. Reynoso-Rodriguez's first and only criminal conviction. A File p. 9. The entire family worked in the fields harvesting crops and became involved in the Oroville community. A File p. 319. Mr. Reynoso-Rodriguez consistently worked in Northern California and Oregon from the time he was 18 until the time of his first and only arrest. A File p. 274. Mr. Reynoso-Rodriguez's parents still live in the home in which Mr. Reynoso-Rodriguez grew up, and in which Mr. Reynoso-Rodriguez will live if he is released on bond. Mr. Reynoso-Rodriguez has extremely strong ties to the Oroville area, and numerous members of that community have written letters attesting to his excellent character. A File pp. 318-70. In these letters, friends, family, and community members all state that generally Mr. Reynoso-Rodriguez has been a kind, helpful, peaceful person. *See, e.g.,* A File p. 322.

---

[1] Petitioner's "A File" was submitted to the Court by Respondents on June 2, 2008.

*Reynoso-Rodriguez v. Napolitano, et al.*
Civ. S-08-321 MCE KJM
Petitioner's Reply to Objections to F & Rs         2

1    In 1997 Mr. Reynoso-Rodriguez married a woman he met in the Oroville area and began residing with her and her two daughters.  On June 8, 2002, after the family had lived together peaceably for several years, Mr. Reynoso-Rodriguez went to his brother-in-law's home to watch a boxing match and returned home inebriated.  According to his wife, he threatened both her and her two daughters that night.  A File pp. 142-147.[2] As can be seen in the documents related to the conviction that are contained in Mr. Reynoso-Rodriguez's A File, although the conduct to which he pled guilty--threatening his wife and two stepdaughters--was certainly troubling, he did not actually use violence against the children or physically touch the children or their mother in any way. Moreover, there is no indication that Mr. Reynoso-Rodriguez has had a similar outburst either before or since the date of the offense.  Indeed, aside from a an auto-related infraction, Mr. Reynoso-Rodriguez has had no other brushes with the criminal law.

Mr. Reynoso-Rodriguez was tried on these charges and on June 18, 2003, the court declared a mistrial.  Ultimately, rather than face a second trial, on August 20, 2003, Mr. Reynoso-Rodriguez pled nolo contendere to two counts of false imprisonment by violence, one count of making criminal threats, and one count child abuse.  A File pp. 142-46.  He was sentenced to a term of 8 years.  A File. p. 186.  Mr. Reynoso-Rodriguez served his

---

[2] Mr. Reynoso-Rodriguez has never had a clear memory of events on the night in question.  This is not surprising because everyone agrees that Mr. Reynoso-Rodriguez was intoxicated that night.  In addition, Mr. Reynoso-Rodriguez has a long-term learning disability and was in an automobile accident in 1997 that appears to have caused a brain injury.  A File p. 287.  Doctor Stephen Foster, a neurologist, examined Mr. Reynoso-Rodriguez in May of 2002 (before the incident), and noted that Mr. Reynoso-Rodriguez was exhibiting "some memory impairment," a condition that had also been noted by at least one of Mr. Reynoso-Rodriguez's treating physicians.  A File p. 287. Memory impairment would be consistent with injury to the left temporal/parietal region of the brain, and that is the area of the head that Mr. Reynoso-Rodriguez injured in the automobile accident.  *Ibid*.  Dr. J.A. Quaytam, a psychologist who examined Mr. Reynoso-Rodriguez in 2003, also observed some memory impairment when she administered tests to Mr. Reynoso-Rodriguez.  *Ibid*.  Dr. Quaytam's test suggested that Mr. Reynoso-Rodriguez has both a history of learning disability and neurological damage caused by the automobile accident.  A File p. 291.

*Reynoso-Rodriguez v. Napolitano, et al.*
Civ. S-08-321 MCE KJM
Petitioner's Reply to Objections to F & Rs          3

1  sentence in state prison without incident.  Indeed, his good behavior in prison earned him
2  an opportunity to participate in a Conservation Camp Program, the CDCR firefighting
3  program for inmates who have clean disciplinary histories.
4        On June 2, 2006, at the end of his federal prison sentence, Mr. Reynoso-Rodriguez
5  was picked up by federal immigration authorities and put into removal proceedings.  He
6  has remained in immigration detention for the past three and one-half years as his case has
7  gone up and down the federal immigration judicial system.  Currently, his challenge to his
8  removal order is pending before the United States Court of Appeals for the Ninth Circuit,
9  and that Court has stayed his removal while it decides his case.
10        For much of the time that Mr. Reynoso-Rodriguez has spent in immigration
11  detention he was deemed to be subject to mandatory detention under 8 U.S.C. Section
12  1226(c) and not given any type of bond hearing.  In July of 2008, however, the Ninth
13  Circuit held in *Casas-Castrillon v. Department of Homeland Sec.*, 535 F.3d 942, 947-48
14  (9th Cir. 2008), that Section 1226(c)'s "mandatory detention provision applies only to
15  expedited removal of criminal aliens" (internal quotations omitted).  When, as in the case
16  of Mr.Casas-Castrillon and Mr. Reynoso-Rodriguez, removal periods last for a matter of
17  years, the statutory authority for continued detention shifts to 8 U.S.C. § 1226(a) at the
18  time that the case moves from the Board of Immigration Appeals ("BIA") to a United
19  States Court of Appeals.  *Casas-Castrillon*, 535 F.3d at 948.  Under 8 U.S.C. Section
20  1226(a), the *Casas-Castrillon* Court held, Mr. Casas-Castrillon was entitled to a bond
21  hearing before a neutral decision-maker.  *Casas-Castrillon*, 535 F.3d at 949-50.  The
22  Court further specified that Mr. Casas-Castrillon was "entitled to release on bond unless
23  the government establishes that he is a flight risk or will be a danger to the community."
24  *Casas-Castrillon*, 535 F.3d at 951 (internal quotations and citations omitted).
25        On November 19, 2008, pursuant to *Casas-Castrillon*, Mr. Reynoso-Rodriguez was
26  given a bond hearing before an Immigration Judge ("IJ") in San Diego.  No tape recording
27  *Reynoso-Rodriguez v. Napolitano, et al.*
    Civ. S-08-321 MCE KJM
28      Petitioner's Reply to Objections to F & Rs        4

1 or other transcription of the event was made.  The IJ decided that Mr. Reynoso-Rodriguez
2 bore the burden of proving that he was not a flight risk a danger to the community, and she
3 found that he had not proven his lack of dangerousness to her satisfaction.[3]  Thus, she
4 denied Mr. Reynoso-Rodriguez bond.

5 Mr. Reynoso-Rodriguez appealed the IJ's decision to the BIA.  That tribunal
6 affirmed the IJ's decision, reasoning that even though the IJ erred in placing the burden of
7 proof on Mr. Reynoso-Rodriguez, it "agree[d] with the Immigration Judge that the [Mr.
8 Reynoso-Rodriguez] presents a danger to the community" because of (1) his sole criminal
9 conviction, and (2) a six-year-old disciplinary write-up from the Butte County Jail for
10 "aggressive behavior" in connection with a dispute over a television set.[4]

11 In this federal habeas corpus action, Mr. Reynoso-Rodriguez asserts that his
12 detention is unconstitutional because he has still not been given a bond hearing that
13 comports with due process requirements.

14 **III.   Magistrate Judge's Findings and Recommendations**

15 The magistrate judge correctly articulates a fundamental flaw in the bond hearing
16 Mr. Reynoso-Rodriguez was given: the IJ not only erroneously placed the burden of proof
17 on Mr. Reynoso-Rodriguez, she also made her decision without any reference to a
18 standard of proof.  F & Rs, pp. 8-9.  As the magistrate judge observed, a bond hearing can
19 only meet due process standards if the standard of proof to be used is calibrated *in*
20 *advance*.  F & Rs, p. 10.  The magistrate judge further reasoned that in light of the fact that
21 bond hearings involve individual liberty, denial of bond on the ground that an individual

---

[3] See Exhibit A to Petitioner's Opposition to Motion to Dismiss for Mootness (Clerk's Record No. 19), p. 5: "Respondent's request for release on bond is denied where *Respondent cannot persuade the Court that he is not a danger to the community*.) (Emphasis added).

[4] See attachment to Notice of Decision by the Board of Immigration Appeals (Clerk's Record No. 28)

*Reynoso-Rodriguez v. Napolitano, et al.*
Civ. S-08-321 MCE KJM
Petitioner's Reply to Objections to F & Rs             5

presents a danger to the community must be supported by "clear and convincing" evidence that a person would present a current threat of danger to the community if released on bond. F & Rs, pp. 11-12. The magistrate judge recommended that the court conditionally grant the writ, ordering that Mr. Reynoso-Rodriguez be released from custody unless, within a specified time, he is given a new bond hearing before an IJ at which the correct standard of proof is understood and applied. F & Rs, pp. 13-14.

### IV. Respondents' Objections to the Magistrate Judge's Findings and Recommendations

In their Objections to the F & Rs, Respondents focus on their argument that the government should not be required to meet a "clear and convincing" standard of proof in order to support the continued long-term detention of a person challenging a removal order in federal court. Respondents also argue that any errors in the bond hearing were corrected by the BIA on appeal. What Respondents do *not* address is the magistrate judge's discussion of the fact that a bond hearing that is not governed by any pre-calibrated standard of proof does not comport with due process requirements, and that this error cannot be corrected through appellate review by the BIA. Each of these topics is addressed below.

### V. Argument

#### A. Mr. Reynoso-Rodriguez's Bond Hearing Was Deficient Because the Immigration Judge Did Not Know What Standard of Proof Applied, and this Error Was Not Corrected by the Board of Immigration Appeals.

As the magistrate judge correctly concludes, a bond hearing is fundamentally unfair if it is not governed by a pre-calibrated standard of proof. See F & Rs, pp. 8-9. The magistrate judge's conclusion flows directly from the Supreme Court's holding in *Santosky v. Kramer*, 455 U.S. 745 (1982). In *Santosky*, the Court considered parental rights in connection with the state's termination of parental rights. After recognizing that parents have a fundamental liberty interest in the care, custody, and management of their

*Reynoso-Rodriguez v. Napolitano, et al.*
Civ. S-08-321 MCE KJM
Petitioner's Reply to Objections to F & Rs            6

child that is protected by the Fourteenth Amendment, the Court held that due process requires that the State support its allegations by at least "clear and convincing evidence" at a hearing to terminate parental rights. The Court explained that the use of a weaker standard of proof could not be cured through other procedures such as appeal:

> Since the litigants and the factfinder must know at the outset of a given proceeding how the risk of error will be allocated, the standard of proof necessarily must be calibrated in advance. Retrospective case-by-case review cannot preserve fundamental fairness when a class of proceedings is governed by a constitutionally defective evidentiary standard.

*Santosky*, 455 U.S. at 757. *See also Mansour v. King County*, 128 P.3d 1241, 1247 (Wash. App. 2006) ("The lack of a clearly ascertainable adequate standard of proof violated Mansour's procedural due process rights," and appellate review did not cure error).

Here, the IJ not only incorrectly shifted the burden of proof, she also failed to articulate any standard of proof. The litigants did not know what standard of proof had to be met, or upon whom the burden rested. Similarly, the BIA did not articulate a standard of proof when it found the IJ's error harmless. As the magistrate judge correctly concluded, a constitutionally required bond hearing in which there is no ascertainable standard of proof that the government must meet cannot comply with due process, and that alone requires a new bond hearing in which the parties know at the outset both who bears the burden of proof and what standard of proof must be met. *Santosky*, 455 U.S. at 757.

**B. The Magistrate Judge Correctly Identified the "Clear and Convincing" Standard of Proof as the Proper Standard of Proof for a Procedure Governing an Individual's Liberty.**

Respondents use the majority of their Objections to argue that holding the government to a "clear and convincing" standard of proof in a bond hearing is not warranted. Respondents first claim that persons such as Mr. Reynoso-Rodriguez cannot be compared to others in civil detention because his detention is not indefinite; presumably it will come to an end when the Ninth Circuit litigation regarding his removal

*Reynoso-Rodriguez v. Napolitano, et al.*
Civ. S-08-321 MCE KJM
Petitioner's Reply to Objections to F & Rs                7

order comes to an end.   However, Respondent does not cite any cases supporting its proposition that lengthy civil detention of the type Mr. Reynoso-Rodriguez currently endures is not constitutionally problematic because it is tied to a phase of litigation that will end someday.  Indeed in *United States v. Salerno*, 481 U.S. 739, 750  (1987), the Supreme Court made clear that the constitutionality of pre-trial detention under the Bail Reform Act was dependent on the existence of  "a full-blown adversary hearing, [in which] the Government must convince a neutral decisionmaker by *clear and convincing evidence* that no conditions of release can reasonably assure the safety of the community or any person." (Emphasis added).  The fact that pre-trial detention will terminate when a person is either convicted or acquitted does not mean that the government should be spared from the "clear and convincing" standard of proof.

The Respondents also argue that Mr. Reynoso-Rodriguez's detention is unlike detention within other schemes because "[t]he detention is also partially within the control of the petitioner. Should the petitioner at any point wish to abandon the stay of removal, he could do so and effectively end his detention by conceding to removal." Objections, p. 5. The Respondents essentially argue that Mr. Reynoso-Rodriguez should be forced to choose between his legal right to challenge his removal order and his constitutional right to be free from civil detention in the absence of robust procedural protections.   Putting Mr. Reynoso-Rodriguez to such a choice would violate the  "unconstitutional conditions" doctrine, which "limits the government's ability to exact waivers of rights as a condition of benefits." *United States v. Scott*, 450 F.3d 863, 866 (9th Cir. 2006).  Moreover, the Ninth Circuit has already implicitly rejected an argument that immigration detention that occurs while a person challenges a removal order is somehow voluntary; binding precedent provides that persons challenging removal orders in the United States Court of Appeal have a constitutionally protected liberty interest that is implicated by their detention.  *See Casas-Castrillon*, 535 F.3d at 951 ("[b]ecause the prolonged detention of an alien without

*Reynoso-Rodriguez v. Napolitano, et al.*
Civ. S-08-321 MCE KJM
Petitioner's Reply to Objections to F & Rs             8

1  an individualized determination of his dangerousness or flight risk would be
2  'constitutionally doubtful,' we hold that § 1226(a) must be construed as requiring the
3  Attorney General to provide the alien with such a hearing."); *Prieto-Romero v. Clark*, 534
4  F.3d 1053, 1065 (9th Cir. 2008) ("due process requires adequate procedural protections to
5  ensure that the government's asserted justification for physical confinement outweighs the
6  individual's constitutionally protected interests in avoiding physical restraint.")(internal
7  citations and quotations omitted): *Tijani v. Willis*, 430 F.3d 1241, 1242 (9th Cir. 2005)(
8  holding that "it [was] constitutionally doubtful that Congress may authorize imprisonment
9  of [two years and eight months] for lawfully admitted resident aliens who are subject to
10 removal" but challenging their removal orders) .

11 Respondents fail to cite an alternative standard of proof that should be used, much
12 less to present an argument for use of a standard of proof lower than "clear and
13 convincing" evidence.   This is not surprising because the Supreme Court has consistently
14 held that the Constitution requires the Government to prove allegations that support
15 prolonged civil detention under a heightened standard of proof.  For example in *Addington*
16 *v. Texas*, 441 U.S. 418, 432-33 (1979), the Court held that a state must justify civil
17 commitment by clear and convincing evidence of mental illness and dangerousness, not by
18 a mere preponderance of the evidence.  Later, in *United States v. Salerno*, 481 U.S. 739
19 (1987), the Court upheld the Bail Reform Act's pre-trial detention scheme only after
20 observing that the Government bore the burden to prove by clear and convincing evidence
21 that an individual was dangerous.   In *Foucha v. Louisiana*, 504 U.S. 71 (1992), the Court
22 struck down a civil commitment statute on due process grounds because it did not require
23 the state to prove danger to the community by *clear and convincing evidence*, and instead
24 put the burden on the detainee to prove that he was not a danger.  *Id*. at 81-82.  Five years
25 later in *Kansas v. Hendricks*, 521 U.S. 346, 368 (1997), the Court upheld involuntary civil
26 commitment for periods of one year at a time, subject to "strict procedural safeguards"

27 *Reynoso-Rodriguez v. Napolitano, et al.*
   Civ. S-08-321 MCE KJM
28 Petitioner's Reply to Objections to F & Rs        9

including right to jury trial before state court and imposition of burden of proof beyond a reasonable doubt on the government.

Furthermore, the Ninth Circuit has indicated that an immigration bond hearing should comport with the due process requirements applicable to hearings regarding other types of civil commitment. As the F & Rs point out, in *Tijani*, the 2005 Ninth Circuit case establishing the right of a long-term immigration detainee to a bond hearing while he challenged his removal order, the Ninth Circuit cited *Cooper v. Oklahoma*, 517 U.S. 348, 363 (1996), after it held that Mr. Tijani was entitled to a bond hearing. *Tijani*, 430 F.3d at 1242. In the page of *Cooper* cited by the *Tijani* Court, the Supreme Court observed that "due process places a heightened burden of proof on the State in civil proceedings in which the individual interests at stake . . . are both particularly important and more substantial than mere loss of money." *Cooper*, 517 U.S. at 363 (internal quotations omitted). *Cooper* itself specifically cited to civil detention cases in which the Court held that the government bore the burden of proving its allegations by clear and convincing evidence. *See Cooper*, 517 at 363 (citing *Santosky*, *Addington*, and other cases holding the state to a heightened burden of proof when important individual interests are at stake).

In summary, as the magistrate judge recommends, in detention hearings concerning persons in long-term immigration detention, the Government should have to prove by clear and convincing evidence that detention is justified. An individual's interest in being free from detention is enormous. A hearing with no defined standard of proof or with a preponderance standard is not appropriate to protect that interest. Moreover, the Government's interests, while legitimate, are not nearly as fundamental as the individual's interest in liberty, and so it would not make sense for the Government and the individual to "share the risk of error in roughly equal fashion." *Addington*, 441 U.S. at 423. In addition, a heightened burden of proof not only reduces the risk that an individual will be wrongfully detained, but symbolizes the importance society places on individual liberty.

*Reynoso-Rodriguez v. Napolitano, et al.*
Civ. S-08-321 MCE KJM
Petitioner's Reply to Objections to F & Rs          10

**C. The Magistrate Judge Recommends the Proper Remedy**

The magistrate judge recommends that:

> the court order a conditional grant of the petition and order that petitioner receive a new hearing before an IJ no later than thirty days after the entry of the order conditionally granting the petition. The court should also instruct the IJ to require the government to show by clear and convincing evidence that the petitioner presents a current danger to the community. . . . [I]n the interest of judicial efficiency and as an aid to the court's supervision of a conditional grant of the petition, should any supervision become necessary, the undersigned will recommend that the hearing before the IJ be recorded in a manner such that it can be transcribed and reviewed.

F & Rs, p. 13.

In their Objections, Respondents suggest an alternate remedy: "the case should be remanded not to the Immigration Judge for a new bond hearing, but to the Board of Immigration Appeals to articulate the standard of proof in the first instance." Objections, p. 6. This suggested remedy would muddle the issues and delay resolution of the case. As argued above, Mr. Reynoso-Rodriguez has a due process right to certain procedural protections in his bond hearing, including the right to have the government prove its allegations by clear and convincing evidence. This Court can so hold, and if it does then there is no reason to send this case to the BIA to re-state the standard of proof. Indeed, the Board of Immigration Appeals has no jurisdiction to adjudicate constitutional issues. *Bagues-Valles v. Immigration & Naturalization Service*, 779 F.2d 483, 484 (9th Cir. 1985). Instead, the federal court is the proper body to decide whether immigration authorities are carrying out detention statutes in a constitutionally permissible manner. *See Zadvydas v. Davis*, 568 U.S. 678, 695 (2001) (rejecting argument that federal courts must defer to decisions of legislative and executive branch with respect to whether immigration detention scheme deprived immigration detainees of due process).

In addition, as the magistrate judge points out, the error of holding the bond hearing without any pre-calibrated standard of proof cannot be corrected on appellate review, and thus the BIA would have to remand this case to the IJ for a new bond hearing in any case.

*Reynoso-Rodriguez v. Napolitano, et al.*
Civ. S-08-321 MCE KJM
Petitioner's Reply to Objections to F & Rs                 11

1  Finally, because there is no record of Mr. Reynoso-Rodriguez's initial bond hearing,
2  unless this Court orders a new bond hearing that is tape-recorded so it can be transcribed
3  for review, there will be no way for this Court to evaluate whether Mr. Reynoso-
4  Rodriguez has actually been given a constitutionally adequate bond hearing.  In a case
5  such as this where timing is of the essence since Mr. Reynoso-Rodriguez is challenging
6  his prolonged detention, this Court should adopt the practical remedy recommended in the
7  F & Rs.

## VI. Conclusion

For the foregoing reasons, Petitioner Reynoso-Rodriguez urges this Court to adopt the magistrate judge's Findings and Recommendations and order the remedy suggested therein.

Dated: October 30, 2009

Respectfully submitted,

DANIEL J. BRODERICK
Federal Defender


*/s/ Carolyn M. Wiggin*
CAROLYN M. WIGGIN
Assistant Federal Defender

Attorney for Petitioner
RAUDEL REYNOSO-RODRIGUEZ

*Reynoso-Rodriguez v. Napolitano, et al.*
Civ. S-08-321 MCE KJM
Petitioner's Reply to Objections to F & Rs         12